**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
**MICHAEL FYNAN,**

                                              **Index No. 1:22-cv-2892**
                            **Plaintiff,**

**v.**                                        **COMPLAINT AND JURY DEMAND**

**KAVULICH & ASSOCIATES, P.C.,**
**GARY KAVULICH,**
**WICK HOLDING CORP., and**
**LANGSAM PROPERTY SERVICES CORP.,**
                            **Defendants.**
-------------------------------------------------------------x

Plaintiff Michael Fynan files suit against Defendants Kavulich & Associates, P.C. ("The Kavulich Firm") and Gary Kavulich (collectively "Kavulich Defendants") for their violations of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et. sec.* (the "FDCPA") and N.Y. Judiciary Law § 487 and against Kavulich Defendants, Wick Holding Corp. ("Wick"), and Langsam Property Services Corp. ("Langsam") for their violations of New York General Business Law § 349 and committing gross negligence, alleges as follows:

### SUMMARY OF CLAIMS[1]

Michael Fynan was a model tenant for Defendants Wick Holding Corp. and Langsam Property Services Corp. – he paid his rent, gave notice well ahead of time when he decided not to renew his lease, left the apartment at the end of his lease term, and sent them a notarized letter confirming that he had left. Unfortunately for Mr. Fynan, Wick and Langsam are not model landlords, falsely telling Mr. Fynan that he was liable for rent incurred by other tenants several months after he left. Wick and Langsam have a policy of trying to collect debts from holdover tenants from former tenants, exploiting tenants like Mr. Fynan that they know can and will pay

---

[1] This summary is for the convenience of Defendants and the Court. The summary is not intended to limit the basis of Plaintiff's claims as the full factual basis for the claims are laid out in far greater detail in the statement of facts.

their debts. Even though Mr. Fynan was no longer tenant, he still tried to help Defendants obtained the alleged rent from the holdover tenants, but Defendants did not respond to him and he assumed the matter had been resolved.

Mr. Fynan was shocked then to receive a Collection Letter for over $10,000 from Kavulich & Associates, P.C., signed by Gary Kavulich, who had been hired by the Landlord to go after Mr. Fynan for this debt that he did not owe. Mr. Fynan sent Kavulich Defendants irrefutable proof that he did not owe the debt, particularly his communications with Langsam, and when Kavulich Defendants did not respond he once again believed the matter had been resolved. But instead, Defendants filed a Collection Lawsuit against him for over $10,000 of rental arrears that he did not owe.

Ultimately Mr. Fynan retained a legal services attorney, Mary McCune, who sent Kavulich Defendants a letter that again gave them irrefutable proof that Mr. Fynan was not liable for the debt – documents Kavulich Defendants had in their possession prior to filing suit. Even after receiving this letter, Kavulich Defendants suggested that they would continue the Collection Lawsuit and that Ms. McCune would have to file a motion to dismiss, but right before she did Kavulich Defendants finally entered into a stipulation of discontinuance, dismissing with prejudice Mr. Fynan from the Collection Lawsuit.

The repeated attempts to collect a debt not owed from Mr. Fynan over 2 years, first by the Landlord via their emails to Mr. Fynan and later by Kavulich Defendants, on behalf of the Landlord, via the Collection Letter and the Collection Lawsuit, caused a great deal of anxiety and stress for Mr. Fynan. The Collection Lawsuit was served on his roommate, so he worried that she would believe its false statements and think he was irresponsible and would shirk their bills. And he lost sleep worrying that Kavulich Defendants would somehow be able to make him

liable for the over $10,000 debt despite that he did not owe it.

## JURISDICTION AND VENUE

1.      The Court has subject matter jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1331 because the dispute involves predominant issues of federal law under the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et. sec.* (the "FDCPA").

2.      The Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367 because they are so related to Plaintiff's claims within the Court's original jurisdiction as to form part of the same case or controversy under Article III of the United States Constitution.

3.      Venue is proper because all or a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in New York County, New York.

## THE PARTIES

4.      Plaintiff Michael Fynan ("Mr. Fynan") is an individual who now resides in Kings County, New York but previously resided in New York County, New York.

5.      Mr. Fynan is a consumer as defined by 15 U.S.C. § 1692a(3) because he is alleged to owe a debt to Defendant Wick, arising from putative rental arrears for Mr. Fynan's former residence.  Plaintiff's alleged obligation is a "debt" as defined by 15 U.S.C. § 1692a(5) because it was incurred primarily for family, personal, or household purposes.

6.      Defendant Wick Holding Corp. ("Wick") is a limited liability company organized under the laws of the State of New York.  Wick engages in business in New York State and this suit arises out of Wick's business in New York State.

7.      Wick was the petitioner in the collection lawsuit against Mr. Fynan, and alleged

that it was the landlord of Mr. Fynan's former residence.

8.     Defendant Langsam Property Services Corp. ("Langsam") is a domestic business organized under the law of the State of New York. It is a resident of the Bronx, NY, and was building management of Mr. Fynan's New York residence.

9.     Langsam is a major property management firm, responsible for the day-to-day operations of about 350 buildings throughout New York City and Westchester County, including over 11,000 residential units.

10. Langsam shares an address, 1601 Bronxdale Ave., Suite 201, Bronx, NY 10462 with Wick (collectively "The Landlord").

11. The New York Secretary of State lists Wick's "Chief Executive Officer's Name and Address" as Stanley Stahl c/o Langsam Property Services Corp., 1601 Bronxdale Ave., Bronx, NY, 10462.

12. Langsam performs all of the operations of Wick, including but not limited to the attempts to collect the putative debt at issue in this case. Therefore Wick is jointly and severally liable for the violations of Langsam.

13.     Defendant Kavulich & Associates, P.C. ("The Kavulich Firm") is a debt collection law firm organized under the laws of the State of New York. The Kavulich Firm engages in business in New York State and this suit arises out of the Kavulich Firm's business in New York State. The Kavulich Firm's principal place of business is in Port Chester, NY 10573.

14.     The Kavulich Firm specializes in – almost exclusively -- collecting putative rental arrears by filing hundreds (if not thousands) of rental arrears lawsuits, and by executing on tens of thousands of judgments rendered against consumer tenants.

15.     Defendant Gary Kavulich is an individual who resides in the State of New York. Mr. Kavulich is the principal of the P.C. and personally performed most of the acts and omissions that give rise to the claims in this action.

16.     Prior to starting his own firm, Mr. Kavulich worked for a major landlord tenant firm and made thousands of appearances on behalf of landlords seeking rental arrears and eviction.

17.     The Kavulich Firm and Mr. Kavulich (collectively "Kavulich Defendants") are debt collectors as defined in 15 U.S.C. § 1692a(6) as they regularly collect or attempt to collect, directly or indirectly, debts owed or due or asserted to be due another, and that is their principal purpose. Specifically, Kavulich files thousands of collections lawsuits in civil court and seeks to enforce thousands of putative rental arrear debts.

18.     The Kavulich Defendants were acting as the agent of the Landlord in its litigation and other attempts to collect the putative debt. Kavulich Defendants were acting within the course and scope of their employment. Kavulich Defendants were the freely chosen counsel of the Landlord. Therefore the Landlord is jointly and severally liable for the conduct of the Kavulich Defendants. Further, given the public records of the systematic debt collection violations of Kavulich Defendants, the Landlord is liable for negligent hiring and supervision of Kavulich Defendants.

## STATEMENT OF FACTS

### *The Lease and the Ownership of the Residence*

19.     460 West 147th Street is a residential apartment building in New York, NY ("the Building").

5

20.    From the time Mr. Fynan moved into the Building up until he moved out on September 30, 2019, the building was owned by Wick and operated by Langsam.

21.    Wick is a holding corporation that is only an alter ego of Langsam, and the two entities function as parts of a single enterprise.

22.    Wick's UCC Financing Statement filed on or around June 17, 2002 lists as a secured party "Joremi Enterprises Inc." which, like Wick and Langsam, lists its address as 1601 Bronxdale Ave., Bronx, NY 10462. **Exhibit A** (UCC Filing for the Building).

23.    While Wick would be listed as the landlord on the lease, and subsequently the plaintiff in the illegal collection lawsuit filed against Mr. Fynan, Langsam handled all matters pertinent to Wick's relationship with Mr. Fynan, including but not limited to the disputes at issue in this action.

24.    And notably, the Lease has both Wick and Langsam as signatories, with Langsam listed as the managing agent. *See* **Exhibit B** (The Lease), p. 4.

25.    On or around September 13, 2015, Michael Fynan moved into Apartment No. 22 located at 460 W. 147 Street ("the Residence"), owned by Defendant Wick and managed by Defendant Langsam. **Exhibit B**.

26.    On or around December 19, 2018, Mr. Fynan signed a lease renewal, with that lease term set to expire on September 30, 2019. **Exhibit C** (Last Lease Renewal).

### *The Termination of the Lease and the Landlord's Initial Misrepresentations*

27.    On or around August 2, 2019, Mr. Fynan decided that he would not be renewing his lease for the Residence again, and accordingly sent an email to Langsam on August 2, 2019 providing notice that he would not be renewing the lease and asking how he will get back his

portion of the deposit. **Exhibit D** (August Emails). Not receiving a response, Mr. Fynan sent another email to Langsam on August 12, 2019. *Id.* Langsam responded to this email on August 12, 2019, asking if someone would be replacing him. Mr. Fynan said there would be, and Langsam stated that the new tenant should contact Langsam and, once approved, that Mr. Fynan's portion of the security deposit would be returned via the new tenant paying that portion in a security deposit. *Id.*

28.     The Lease states that "Any balance of the security deposit after allowable deductions shall be returned to the Tenant after the Tenant has moved from the apartment at the end of the lease." **Exhibit B**.

29.     Accordingly, Mr. Fynan should have been provided with his portion of the security deposit upon his termination of the lease on September 30, 2019, regardless of whether he was replaced by new tenants in a new lease renewal.

30.     As of this filing, Mr. Fynan has still not been provided his portion of the security deposit, $836.59.

31.     There is no provision in the Lease providing for an automatic renewal of lease – in fact, there are no provisions in the Lease governing renewal of the lease at all. *Id.*

32.     The Last Lease Renewal provides "This Renewal Lease shall terminate on 9/30/2019 (1 year lease)." **Exhibit C**. There are no provisions in the Last Lease Renewal providing for an automatic renewal of the lease. *Id.*

33.     Accordingly, Mr. Fynan's prompt notice on August 2, 2019 that he would not be renewing the lease and subsequent vacating of the Residence on September 30, 2019 ended any obligation, by contract or operation of law, that Mr. Fynan had for paying rent at the Residence.

34.     However, while Mr. Fynan and his co-tenant Naina were not renewing the lease, his co-tenants Hailee and Patrick expressed their intent to renew the lease with new co-tenants.

35.     Despite having no legal obligation to do so, Mr. Fynan generously spent a considerable amount of time attempting to assist both the Landlord and his former co-tenants to have new tenants added to a new lease.

36.     The Landlord took advantage of this generosity by falsely claiming, in several emails between December 16, 2019 and July 1, 2020, that Mr. Fynan was legally obligated for rent that became due and was unpaid during months after Mr. Fynan had terminated the lease.

37.     On December 16, 2019, Langsam emailed both Mr. Fynan and the current tenants of the Residence, stating that a rent balance was due of over $10,000 and "The 4 of you [Mr. Fynan, Naina, Hailee, and Patrick] are responsible until this is resolved." **Exhibit E** (December 16, 2019 Emails).

38.     Langsam threatened Mr. Fynan and the others: "If this is not resolved within 5 days legal action to collect and evict will be taken against all on the lease including co-signers. I suggest you get this situation under control asap."

39.     This was false – without a lease renewal executed, the lease had been terminated, and thus only the tenants who had remained in the apartment could be legally liable for rent as holdover tenants.

40.     This was a deceptive and cynical policy by the Landlord to demand payment from and even threaten to sue former tenants for amounts they did not owe in order to collect on debts incurred by other tenants. In other words, the Landlord knows a tenant like Mr. Fynan can and will make payments, and so tries to trick them into doing so rather than collecting the debt from

the parties who actually owe it.

41.    The "new tenants," having failed to execute a lease renewal, could not be legally liable for rent. The putative holdover tenants, Hailee and Patrick, were not paying rent. But Mr. Fynan had been a responsible tenant and was continuing to try to help despite having no legal obligation to do so, so the Landlord falsely claimed that he was legally liable since he was more likely to pay if he believed he was obligated to.

42.    Regardless of the motive, the Landlord has a deceptive policy of holding former tenants liable for rent incurred by other holdover tenants, as demonstrated by the emails stating that former tenants "are responsible" for the rental arrears and that legal action could be taken against them, as well as the later Collection Letter and Collection Lawsuit against Mr. Fynan.

43.    Because Langsam manages about 11,000 residential dwellings, this policy could injure thousands of tenants like Mr. Fynan who have paid their rent and complied with their leases.

44.    As the Landlord had asked him to do, Mr. Fynan sent the notarized letter confirming his termination of the lease and providing an address to send his security deposit. **Exhibit F** (Notarized Letter). Mr. Fynan emailed Langsam repeatedly asking for confirmation that this letter had been received and when he would get his deposit money back. **Exhibit G** (Emails Asking for Confirmation).

45.    Langsam only responded, on February 27, 2020, "Yes I didn't forget," and subsequently on March 25, 2020, "We are currently working remotely. Therefore we will complete this when all is back to normal." *Id.*

46.    Then Langsam doubled down on its prior misrepresentations about Mr. Fynan

being legally liable for rent arrears allegedly accrued after his lease had terminated, stating "the lease remains the same and all original occupants are responsible for back rent" and "The [notarized] letter doesn't preclude you until new leases are signed." **Exhibit H** (July 1, 2020 Emails).

47.    Even though he was no longer a tenant, Mr. Fynan did attempt to reach Hailee and Patrick to address the issue, but was not able to reach them.

48.    However, he did not hear further from the Landlord, and assumed that the situation had been resolved.

49.    Unfortunately, the Landlord would instead escalate its misrepresentations into an illegal lawsuit.

### *The Landlord Hires Kavulich Defendants to Send a Deceptive Collection Letter to Mr. Fynan*

50.    Upon information and belief, sometime before April 9, 2021, the Landlord hired Kavulich Defendants to attempt to collect on the rental arrears that the Landlord had previously misrepresented to Mr. Fynan as being owed by him.

51.    On or around April 9, 2021, almost a year after Mr. Fynan had last heard from the Landlord, Kavulich Defendants sent a collection letter demanding, on behalf of Wick, $10,121.40 and threatening to bring a legal proceeding against him. **Exhibit I** (Collection Letter).  Specifically, the letter that their client "has requested that we proceed with legal action against you" and that they are writing to allow a "final opportunity" to pay the debt "without the necessity of costly litigation." *Id*.

52.    Even though Mr. Fynan believed he didn't owe the money, he was very stressed by the letter because it was sent by a lawyer. He thought they might be able to use the law

somehow to make him legally liable for the debt he should not owe.

53.    The law firm letterhead and the physical signature of Mr. Kavulich on the letter, along with the clear and direct threat of litigation, represented to Mr. Fynan that  the Kavulich Defendants had meaningfully reviewed the facts and circumstances of the matter against him and made an independent legal determination that he was liable for the debt sought.

54.    As discussed below, had the Kavulich Defendants reviewed their own file they would have realized Mr. Fynan did not owe the money sought. Specifically, the Rent Ledger showed that the lease ended in September of 2019, and that the rent allegedly owed was incurred thereafter, so only the holdover tenants were responsible for the debt.

55.    At the very least, the documents in the firm's own file should have prompted the Kavulich Defendants to seek clarification regarding the matter before threatening a consumer that they will be dragged into court for "costly litigation" for a debt Mr. Fynan did not owe. The Kavulich Defendants are strictly liable for misrepresenting to Mr. Fynan that he owed a debt that was not owed, and threatening to file suit for a debt that was not owed.

56.    After Mr. Fynan received the letter threatening "costly litigation," he used a vacation day from work to take the day off to do research on what his rights were and how he should dispute the debt.

57.    Mr. Fynan ultimately enlisted the help of a friend and attorney, Scott Brimmer, to reach out to Kavulich Defendants and Wick to resolve the situation.

58.    On April 16, 2021, Mr. Brimmer emailed Kavulich Defendants to request verification of the alleged debt owed by Mr. Fynan. **Exhibit J** (Email Request for Verification).

59.    In response, Kavulich Defendants emailed Mr. Brimmer a "Tenant Profile," a rent

ledger for the apartment dated August 31, 2020. **Exhibit K** (Rent Ledger).

60.     At the top-left of the Rent Ledger is the text "*LANG*," which is presumably short for "Langsam," as Kavulich Defendants would be obtaining documents and information about the account from Langsam as the managing agent of Wick. *Id.*

61.     Also at the top of the first page of this Rent Ledger is the field "Lease End" filled in with "9/30/2019." *Id.* In other words, Wick's own records showed that the lease ended on September 30, 2019, and thus that it could only collect rent from the former tenants after that date if they were holdover tenants.

62.     The Rent Ledger shows that rent up to the month of September 2019 was paid in full. *Id.*, p. 3. Further, the Rent Ledger shows that rental arrears only began to accrue in April 2020 – several months after Mr. Fynan's lease had ended and he had vacated the apartment. *Id.*

63.     Throughout the Rent Ledger, the header lists "M. FYNAN, P. JERRY, H. WRIGHT, N. RAM" – no effort is made to distinguish the holdover tenants legally liable for the rental arrears versus Mr. Fynan, who had no liability as his lease ended and he vacated the premises. *Id.*

64.     On May 4, 2021, Mr. Brimmer emailed Kavulich Defendants, attaching the emails between Mr. Fynan and Wick, and writing "Mr. Fynan clearly tried to have this situation sorted out, but his emails went unanswered by the management company." **Exhibit L** (Email Attaching Notice).

65.     Also on or around May 4, 2021, Mr. Fynan sent Kavulich Defendants a letter explaining the entire situation, most importantly that:

"I have reason to believe I do not owe this debt. I emailed Michael Bayne of Langsam

over 30 days prior to the end of my lease letting him know I would not be renewing, and subsequently, per Michael Bayne's instructions, sent a notarized letter confirming that I had vacated the apartment by the end of the lease, September 30, 2019. All rent was paid in full through the end of the lease…Tenants Hailee Wright and Patrick Jerry, who were on the previous lease with me, continued to occupy the apartment and intended to sign the lease renewal, which Michael Bayne is aware of. This debt belongs to the two of them."

**Exhibit M** (Dispute Letter).

66.    Kavulich Defendants, as experienced landlord-tenant debt collectors, should have been wary of Mr. Fynan's liability based on the Rent Ledger alone showing the termination of the lease on September 30, 2019. However, after the email from Mr. Brimmer on behalf of Mr. Fynan and the Dispute Letter on May 4, 2021, Kavulich Defendants had unequivocal notice that Mr. Fynan had vacated the apartment at the end of his lease and thus had no liability for the alleged debt they were trying to collect from him.

67.    Accordingly, Kavulich Defendants should have ceased their collection activities and reported to their client that Mr. Fynan had no liability for the alleged debt, and that they could only proceed against the holdover tenants.

68.    And for months, Mr. Fynan believed that is what happened since he did not receive any further communications from Defendants until October 20, 2021.

### *Defendants File and Serve a Lawsuit Against Mr. Fynan for*
### *The Rental Arrears for Which He Had No Liability*

69.    On October 8, 2021, the Kavulich Defendants, at the direction of the Landlord, filed a collection lawsuit against Mr. Fynam and one of the holdover tenants, Patrick Jerry, in the Civil Court of the City of New York, County of New York, captioned *Wick Holding Corp. v. Michael Fynan, Patrick Jerry,* CV-024633-21/NY. **Exhibit N** (Collection Lawsuit).

70.    The Collection Lawsuit misrepresents Patrick Jerry as living at the same residence

as Mr. Fynan. *Id.* Mr. Jerry has never lived at this residence and, upon information and belief, Defendants had no reason to believe that Mr. Jerry lived at this address.

71.    Instead, upon information and belief, Defendants misrepresented Mr. Jerry's residence, as well as naming Mr. Fynan as a co-respondent in the Collection Lawsuit, in an attempt to pressure Mr. Fynan to (1) pay the alleged $10,121.40 in rental arrears (which he was not liable for), and (2) provide the contact information for Mr. Jerry so that the debt could be collected from him as well.

72.    The single paragraph allegation of the Collection Lawsuit is false, stating that the debt was owed for Michael Fynan's "use and occupancy for the months of April, 2020…and May, 2020 through and including July, 2020…for the premises known as 460 West 147th Street, Apt. 22 New York, NY 10031." *Id.* Mr. Fynan did not use or occupy 460 West 147th Street, Apt. 22, during the months of April through July 2020 because he had vacated the premises at the end of September 2019, as Defendants were aware from their own records as well as communications made by Mr. Fynan to them after he received the Collection Letter.

73.    On October 20, 2021, the Collection Lawsuit was served on Mr. Fynan's roommate Anna at his new residence.

74.    Anna sent a picture of the Summons to Mr. Fynan by text message. **Exhibit O** (Text Messages). Notably, Anna was confused why a copy of the Collection Lawsuit for Jerry was also served on their address. *Id.*

75.    Mr. Fynan had thought this matter was behind him, so to learn he had now been sued for over $10,000 that he did not owe made him extremely distraught. He retrieved the Collection Lawsuit from his home quickly, texting Anna "Sorry, would've stayed to chat for a

min, but I've gotta get going on calling some [EXPLETIVE] lawyers." *Id.*

76.    As he stated in the text message, Mr. Fynan once again had to take off time from work and spend many hours to try to figure out what his right were and to see if he could find an attorney. He worried about being able to afford an attorney to defend him from a lawsuit for over $10,000, even if he was in the right. Defendants' conduct put pressure on Mr. Fynan to pay a debt he did not owe given the cost of defending against the Collection Lawsuit, such as having to hire a private attorney.

77.    By serving Mr. Fynan the Collection Lawsuit, the Kavulich Defendants impliedly represented to him that they had meaningfully reviewed the facts and circumstances of the case against him and made an independent legal determination that he was liable for the debt sought. This includes not only the principal amount of the debt in the lawsuit, but also the demands for interest, costs, and disbursements.

78.    However, had the Kavulich Defendants reviewed their own file they would have seen the documents in its possession prior to the sending of their April 8, 2021 Collection Letter (**Exhibit I**) and, moreover, the subsequent proof emailed to them on May 4, 2021 (**Exhibit N**), including the correspondence from Langsam explaining it was demanding months of rent from Mr. Fynan that was accrued by others after the end of his lease and after he timely left and otherwise complied with the lease and Langsam's instructions.

79.    A week after receiving the lawsuit, Mr. Fynan filed a *pro se* Answer to the Collection Lawsuit, stating "I do not owe this debt; my lease at 460 W 147th St, Apt 22, ended September 30, 2019. I did not renew and notified management of this. Tenants Patrick Jerry and Hailee Wright remained; this debt is theirs." **Exhibit P** (Answer).

*Defendants Only Discontinue the Lawsuit Against Mr. Fynan After Threatened With Motion Practice By An Attorney*

80.    Mr. Fynan knew that Defendants were not going to do the right thing since he had put them on notice multiple times that he did not owe the debt with indisputable proof, and yet Defendants had still sued him.

81.    After exhaustive research, Mr. Fynan was fortunate enough to find a legal services attorney to assist him, Mary McCune, a staff attorney at Manhattan Legal Services.

82.    Ms. McCune sent the Kavulich Defendants a letter dated November 10, 2021, again providing notice that Mr. Fynan did not owe the debt – attaching documents Kavulich already had in its possession. As such, Ms. McCune demanded that Kavulich Defendants execute a stipulation of discontinuance that she had drafted and attached to her letter. Otherwise, Ms. McCune stated, she would "file the appropriate motion." **Exhibit Q** (Legal Services Letter).

83. Ms. McCune followed up with Mr. Kavulich via email a number of times seeking to obtain a voluntary dismissal, especially as there was an upcoming hearing. **Exhibit R** (Legal Services Emails to Kavulich).  Instead of voluntarily dismissing the suit, on December 5, 2021 Mr. Kavulich tripled down, and indicated he would ask his *per diem* attorney adjourn the hearing "for a few months" so that Ms. McCune could file her motion to dismiss. Via email the next day Ms. McCune responded, "I'll start working on a motion to dismiss then." *Id.*

84. Just before Ms. McCune filed her motion to dismiss, the Kavulich Defendants finally agreed to discontinue the action. Around January 18, 2022, Mr. Fynan and Defendants entered into and filed the Stipulation of Discontinuance that Ms. McCune had drafted and attached to her original letter. **Exhibit S** (Stipulation of Discontinuance).

*Kavulich Defendants Have A History Of Failing To Perform Meaningful Attorney Review, And Have Previously Been Sued For It Multiple Times*

85. Defendants, despite having indisputable written proof that Mr. Fynan did not owe the debt, filed the Collection Lawsuit against him in order to obtain a judgment or pressure him into a settlement.

86. What happened to Mr. Fynan is another example of Kavulich Defendants' long documented process of engaging in debt collection without any meaningful attorney review. Kavulich Defendants either did not perform a meaningful attorney review prior to sending the Collection Letter and Collection Lawsuit to Mr. Fynan. Alternatively Kavulich Defendants did perform a review and filed the Collection Lawsuit knowing that Mr. Fynan did not owe the debt. Kavulich Defendants, a firm that exclusively practices collections for landlords, would want to do what it needed to keep as a client a property management firm of the size of Langsam.

87. Kavulich Defendants have been sued in three previous lawsuits for similar misconduct as they committed against Mr. Fynan: (1) *Prage v. Kavulich & Associates, P.C., et al.,* No. 1:16-cv-01627-CBA-RLM (EDNY) (**Exhibit T**); (2) *Morales v. Kavulich & Associates, P.C., et al.,* No. 1:16-cv-02134-ALC-JLC (SDNY) (**Exhibit U**); and (3) *Creary v. Kavulich & Associates, P.C., et al.,* No. 1:18-cv-02277-JPO-GWG (SDNY) (**Exhibit V**). In *Morales,* the Court granted summary judgment against Kavulich Defendants, finding them liable for violating GBL § 349 for, among other conduct, "falsely implying [Kavulich] had performed a meaningful review in signing and serving the Restraint and Execution." *Morales v. Kavulich & Associates, P.C., et al.,* 294 F.Supp.3d 193, 197 (S.D.N.Y. 2018).

88. Kavulich Defendants have also been excoriated in New York state courts for failing to perform meaningful attorney review.

89. In the federal lawsuits, there was evidence that Kavulich Defendants had failed to perform meaningful attorney reviews as a matter of course and that this conduct illegally harmed

dozens of consumers, and that Kavulich Defendants were aware of this but did not change their policies or procedures in order to address it.

90.     *Prage* and *Morales* both resulted in injunctions being entered against Kavulich Defendants to cease violating the FDCPA and GBL § 349 – injunctions which Kavulich Defendants violating with their conduct in both *Creary* and in the present case. **Exhibit W** (*Prage* Injunction) and **Exhibit X** (*Morales* Injunction).

### *Prage v. Kavulich*

91.     In *Prage*, Kavulich Defendants restrained the bank account of Romain Prage pursuant to a judgment against Mr. Prage for alleged rental arrears. **Exhibit T** (*Prage* Complaint).

92.     Mr. Prage's frozen bank account consisted entirely of unemployment funds, which under the New York Exempt Income Protection Act are exempt from being restrained by debt collectors like Kavulich Defendants. *Id.*

93.     Like Mr. Fynan, Mr. Prage immediately provided Kavulich Defendants notice that they were violating the law by sending an Exemption Claim Form attaching an unemployment award letter. *Id.* But similar to how Kavulich Defendants responded to Mr. Fynan's proof by filing the Collection Lawsuit against him, Kavulich Defendants responded to Mr. Prage's proof by filing a motion for post-possession money enforcement, objecting to Plaintiff's exemption claim and requesting a hearing. *Id.*

94.     On May 7, 2015, Mr. Prage executed an affidavit with irrefutable documentary evidence that the funds in his bank account were exempt from restraint, but Kavulich Defendants still refused to release the money and even restrained the account again after the court ruled

against them. *Id.*

95.    For this conduct, Mr. Prage filed a lawsuit against Kavulich Defendants for violating the FDCPA and GBL § 349. *Id.* Shockingly, on March 9, 2016, after the FDCPA lawsuit had been filed, Kavulich Defendants again attempt to restrain Mr. Prage's bank account. *Id.*

96.    As part of the settlement of the *Prage* lawsuit, Kavulich Defendants entered into a five-year injunction, so-ordered by the Court on May 23, 2018, that required Kavulich Defendants to, among other provisions, "Comply in all manners with their obligations under the Fair Debt Collection Practices Act, N.Y. General Business Law 349, and the N.Y. Exempt Income Protection Act." **Exhibit W** (*Prage* Injunction).

### *Morales v. Kavulich*

97.    In the *Morales* case, James Morales had been sued, along with a former girlfriend named Clara Potter, over rental arrears, but Mr. Morales was never served the collection lawsuit and thus never appeared. **Exhibit U** (*Morales* Complaint).

98.    Ms. Potter entered into a stipulation with the landlord Rosewall per which a judgment was entered for possession of the apartment and a money judgment of $2,601.16 against Ms. Potter. *Id.*

99.    No money judgment was ever entered against Mr. Morales. Despite this, Kavulich Defendants restrained Mr. Morales' bank account on behalf of Rosewall, as if the landlord had a money judgment against him when in fact it did not. *Id.*

100.    In other words, like Mr. Fynan, Kavulich Defendants attempted to collect the judgment from a party that was not responsible for it. *Id.*

101.    Mr. Morales filed suit against Kavulich Defendants for violating the FDCPA and GBL § 349.

102.    Discovery in *Morales* unearthed just how pervasive and unapologetic Kavulich Defendants were in their failure to perform meaningful attorney reviews. The Court made some shocking findings in its Order granting Mr. Morales' motion for summary judgment on liability:

> "As a general practice, Gary Kavulich does not review the information in bank restraints, information subpoenas, as well as other similar documents and just mechanically signs them. From 2007 through 2015, whenever there was an execution involved in any of his cases, Kavulich did not keep track of the amount that was still owed on a judgment. Moreover, during that same time period, when issuing information subpoenas, Kavulich's computer system would automatically enter the amount due as the full judgment amount without crediting the debtor for any payments already received. This led to both the bank and consumer being misinformed about the amount and the bank restraining more than the amount to which Kavulich was entitled. Kavulich was aware of this problem with his computer but chose not to ensure that the amounts were accurate by fixing the computer system. Kavulich has previously enforced non-existent money judgments seven times and also enforced already vacated judgments in seventeen other cases, sometimes holding on to a defendant's money long after the judgment had been vacated."

*Morales v. Kavulich & Assocs., P.C.*, 294 F. Supp. 3d 193, 196 (S.D.N.Y. 2018)

103.    The Court also held that Morales was not precluded from seeking punitive damages against Mr. Kavulich because a question of fact had been created by Morales' presentation of evidence that "Kavulich repeatedly enforces either non-existent or vacated judgments; he is aware that this occurs but has not changed his business practices by fixing his computer system or meaningfully reviewing documents to stop it." *Id.* at 199. Indeed, Kavulich's response to avoid punitive damages was that he was greedy, not malevolent: "Kavulich downplays the severity of his conduct by characterizing it as motivated by a desire to increase profits rather than by maliciousness or malice." *Id.*

104.    As part of the settlement of the *Morales* case, on June 25, 2018, a five-year injunction was entered against Kavulich Defendants, requiring, among other provisions, to

20

"Comply in all manners with their obligations under the Fair Debt Collection Practices Act and N.Y. General Business Law § 349." **Exhibit X** (*Morales* Injunction).

### *Creary v. Kavulich*

105.    In *Creary,* Esmerilda Creary had her bank account restrained by Kavulich Defendants pursuant to a default judgment against her for $3,588.74. **Exhibit V** (*Creary* Complaint).

106.    On April 23, 2010, New York City Marshal Ronald Moses collected $2,976.30 from Ms. Creary by restraining her bank account. *Id.* Despite collecting $2,976.30, Kavulich Defendants restrained Ms. Creary's bank account on November 5, 2013 for the full amount of the judgment against her, $3,588.74. *Id.*

107.    On December 5, 2013, Ms. Creary signed an exemption claim form explaining, under penalty of perjury, that funds in her bank account were exempt because they were Social Security Disability and child support. *Id.* Despite this, Kavulich Defendants restrained the account again in January 2014 for the full amount of the judgment despite most of it being paid. *Id.*

108.    And like in *Prage*, Kavulich Defendants responded to Ms. Creary's exemption claim form by filing a motion for post-possession money enforcement, which made no mention of the fact that the majority of the judgment amount had already been collected via the execution on Ms. Creary's account in 2010. *Id.*

109.    Through this deception, Kavulich Defendants were able to collect even more money from Ms. Creary, taking $1,168.05 on May 19, 2015. *Id.*

110.    However, on November 5, 2015, Ms. Creary was able to successfully have the

Court vacate the default judgment against her and to order Kavulich Defendants to return her money. *Id.*

111.    Kavulich Defendants refused to comply with this Order, and on March 16, 2017, Ms. Creary obtained another order directing Kavulich Defendants to return all funds taken since the judgment had been vacated and the statute of limitations had expired on the debt. *Id.*

112.    Kavulich Defendants still did not return the money for almost a whole year. *Id.*

113.    For this conduct, Ms. Creary filed a lawsuit against Kavulich Defendants for their violations of the FDCPA, GBL § 349, and Judiciary Law § 487, and committing conversion.

### *State Court Cases*

114.    In *3343 Decatur Ave. LLC v. Rios,* 2018 NY Slip Op 50264(U), 2018 WL 1057308 (Civ. Ct. Feb. 26, 2018), Judge Kraus issued a decision denying a motion for a default judgment made by Gary Kavulich "caution[ing] to review pleadings issued and motions filed with greater care before submitting them to this court."

115.    The decision noted that this was not the first time that Mr. Kavulich had been warned by the courts to perform a meaningful review before filing lawsuits and making motions – in *Zadrima v. Thompson,* Index No. CV-009362-16/BX, the court criticized Mr. Kavulich, holding: "The complaint herein is so defective that it is hard to imagine an attorney signed his name to the pleading, and the court can only assume that the attorney who signed the complaint, did so without reading it."

116.    Even more importantly, the court concluded "Had any one of the three attorneys [at Kavulich & Associates, P.C] actually read the complaint, presumably the appropriate corrective action would have been taken." *Id.*

117.    The Court's words are all too applicable to Mr. Fynan's case – had Kavulich Defendants performed any meaningful attorney review, reading the irrefutable evidence sent by Mr. Fynan or just carefully reading the Rent Ledger in their possession, they presumably could have determined that the rental arrears were incurred by holdover tenants and Mr. Fynan was not a holdover tenant and thus not liable for them.

118.    The Court in *3343 Decatur Ave. LLC* also cited in a footnote: "Other examples of defective pleadings submitted by plaintiff's firm and pointed out by this court include the following cases: CV-8129-17, CV-1978-17, CV-6140-16."

### *Defendants' Deceptive Collection Letter and Lawsuit Caused Mr. Fynan A Great Deal Of Stress And Forced Him To Incur Costs To Defend Himself*

119.    Mr. Fynan works in publishing and has a lot of student loan debt, so the prospect of having to pay over $10,000 that he was not responsible for was very stressful.

120.    When he received the Collection Letter it stressed him out, but when Defendants did not respond to his May 4 Letter, he thought it had gone away. But it did not, instead Defendants filed the Collection Lawsuit against him, and it was this prolonged aspect of the situation added to his stress.

121.    Both the Collection Letter and the Collection Lawsuit caused him to lose sleep. Mr. Fynan would go to bed at a normal time but would not be able to sleep because his mind would be racing with possibilities of whether he could somehow be made liable for this debt he did not owe and, if that happened, whether he would have to move back in with his parents, get a deferment from his student loans, or get a new job.

122.    He was kept up with this anxiety about the future and what the Collection Lawsuit could mean for his life.

123.    He took two vacation days from work because of Defendants' conduct – one after receiving the Collection Letter and one after receiving the Collection Lawsuit. He used this time to research debt collection and the law about it on the internet, to post on social media asking for lawyers who deal with real estate in New York, and to lookup and speak to potential lawyers. Because he used these vacation days, he was not able to take off time during the holidays that he had planned on and wanted to take off.

124.    Normally Mr. Fynan is a patient and easygoing person. However, Defendants' conduct made him more irritable, causing him to lash out at his romantic partner at the time and end that relationship. At his work he does a lot of customer service, so being able to be patient is very important for his work.

125.    He felt a persistent simmering in his stomach, even when he was not directly thinking about the Collection Letter or the Collection Lawsuit, Mr. Fynan had that feeling throughout the day, invading other aspects of his life.

126.    He incurred costs for printing and mailing of papers.

127.    The fact that his roommate Anna received the Collection Lawsuit was unnerving to Mr. Fynan. He felt like he had to clarify to her that he did not owe this debt, promise that it was something that he did not do.

128.    Because Anna is his roommate, Mr. Fynan had to make sure that she knew he was not going to shirk on his bills, and he was embarrassed of the potential perception of him that might happen because of the Collection Lawsuit.

129.    Anna is very frugal with her money so Mr. Fynan was worried about what she would think.

130.    The Collection Letter and Collection Lawsuit also reminded Mr. Fynan of all the stress from the end of his previous lease. He attempted to contact Mr. Jerry after receiving the Collection Letter, but Mr. Jerry hung up on him. And to this day, he never received his $836 share of the security deposit.

131.    Even though Mr. Fynan knew that he was not responsible for the debt, he was so stressed because Wick had hired lawyers, the Kavulich Defendants, to come after him, and he thought they might be able to use the law somehow to make him liable. Realistically he knows that people do wind up being liable for things that they are not necessarily liable for – he thought that the Kavulich Defendants could do some legal gymnastics to make him liable.

## CLAIMS

### FIRST COUNT
### Violations of the Fair Debt Collection Practices Act (as to Kavulich Defendants)

132.    Plaintiff repeats and realleges each and every allegation set forth above as if reasserted and realleged herein.

133.    The purpose of the FDCPA is "to eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses." 15 U.S.C. § 1692(e); see also *Hamilton v. United Healthcare of La., Inc.*, 310 F.3d 385, 392 (5th Cir. 2002) ("Congress, through the FDCPA, has legislatively expressed a strong public policy disfavoring dishonest, abusive, and unfair consumer debt collection practices, and clearly intended the FDCPA to have a broad remedial scope.").

134.    Congress designed the FDCPA to be enforced primarily through private parties –

such as plaintiff – acting as "private attorneys general." *See* S. Rep. No. 382, 95th Con., 1st Sess. 5, ("[t]he committee views this legislation as primarily self-enforcing; consumers who have been subject to debt collection abuses will be enforcing compliance"); and *Jacobson v. Healthcare Fin. Servs.,* 516 F.3d 85, 91 (2d Cir. 2008) ("[i]n this way, the FDCPA enlists the efforts of sophisticated consumers like [plaintiff] as 'private attorneys general' to aid their less sophisticated counterparts, who are unlikely themselves to bring suit under the Act, but who are assumed by the Act to benefit from the deterrent effect of civil actions brought by others.").

135.    The obligation alleged to be owed by Plaintiff is a "debt" as defined by 15 U.S.C. § 1692a(5) because the rental arrears were incurred for a residential apartment.

136.    Plaintiff is a "consumer" as defined by 15 U.S.C. § 1692a(3) because Plaintiff was alleged to owe a "debt" as defined by 15 U.S.C. § 1692a(5).

137.    For the reasons set forth in the "Parties" section of this Complaint, the Kavulich Defendants is a "debt collector" as defined in 15 U.S.C. § 1692a(6).

138.    The Kavulich Defendants violated the following sections of the FDCPA: 15 U.S.C. §§ 1692e and 1692f.  By way of example and not limitation Defendant violated the FDCPA by taking the following actions in an attempt to collect a debt or in connection with an attempt to collect a debt: using false, deceptive or misleading representations or means; misrepresenting the character, amount, or legal status of the debt; misrepresenting the services rendered or compensation which may be lawfully received; falsely representing or implying that a communication is from an attorney; threatening to take and actually taking an action prohibited by law; using any false, deceptive or misleading representations or means; using unfair or unconscionable means; and collecting or seeking to collect any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly

authorized by the agreement creating the debt or permitted by law.

139.    As a direct and proximate result of the Kavulich Defendants' violations, Plaintiff has suffered damages, including, *inter alia*, significant emotional distress, embarrassment, humiliation, loss of his two vacation days, and costs of printing and mailing.

140.    The injuries inflicted on Plaintiff by the Kavulich Defendants are concrete and particular, and these injuries have a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts.

141.    Plaintiff suffered economic injuries that historically has provided a basis for lawsuits in American courts, including but not limited to out of pocket expenses for printing and for postage.

142.    Plaintiff's injuries are analogous to, *inter alia*, the following common law claims: defamation, negligence, invasion of privacy, intrusion upon seclusion, and abuse of process.

143.    The Kavulich Defendants had a duty to exercise reasonable care in the collection of debts, including in the selection of companies to attempt to collect the debt, in ensuring that a debt is not linked to the wrong party, and in furnishing agents with accurate information when those agents rely on and use that information in attempting to collect debts.

**SECOND COUNT**
**Deceptive Acts or Practices in Violation of New York General Business Law § 349 (as to all Defendants)**

144.    Plaintiff repeats and realleges each and every allegation set forth above as if reasserted and realleged herein.

145.    New York General Business Law § 349(a) prohibits "deceptive acts or practices in the conduct of any business, trade, or commerce, or in the furnishing of any service in this state." An individual "injured by reason of any violation of this section may bring an action in

his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such action." N.Y. Gen. Bus. § 349(h).

146.    As enumerated above, Defendants violated N.Y. Gen. Bus. § 349 *et seq.* by using deceptive acts and practices in the conduct of their businesses. These acts were done by Defendants systematically and, as such, have had a broad impact on consumers at large.

147.    Defendants committed the above described acts willfully and/or knowingly.

148.    Defendants' wrongful and deceptive acts have caused injury and damages to Plaintiff and unless enjoined will cause further irreparable injury.

149.    As a direct and proximate result of those violations of N.Y. Gen. Bus. § 349 *et seq,* Plaintiff has suffered compensable harm and is entitled to preliminary and permanent injunctive relief, and to recover actual, treble, exemplary, and damages, together with costs and attorney's fees

150.    The Defendants' deceptive conduct towards Plaintiff is the type of conduct that has a broad impact on consumers at large.

151.    That the relevant steps may be taken in a matter of minutes shows a high degree of moral culpability.  Defendants' violations were willful and knowing, or, at minimum, evidence a conscious and reckless disregard for basic fairness and for the law. Defendants' wrongful and deceptive acts caused injury and damages to Plaintiff.

152.    As a direct and proximate result of Defendants' violations, Plaintiff has suffered damages, including, *inter alia*, significant emotional distress, embarrassment, and humiliation.

153.    The injuries inflicted on Plaintiff by Defendants are concrete and particular, and these injuries have a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts.

154.    Plaintiff suffered economic injuries that historically has provided a basis for lawsuits in American courts, including but not limited to out of pocket expenses for printing and for postage.

155.    Plaintiff's injuries are analogous to, *inter alia*, the following common law claims: defamation, negligence, invasion of privacy, intrusion upon seclusion, and abuse of process.

156.    Defendants had a duty to exercise reasonable care in the collection of debts, including in the selection of companies to attempt to collect the debt, in ensuring that a debt is not linked to the wrong party, and in furnishing agents with accurate information when those agents rely on and use that information in attempting to collect debts.

## THIRD COUNT
### Gross Negligence (as to all Defendants)

157.    Plaintiff repeats and realleges each and every allegation set forth above as if reasserted and realleged herein.

158.    Defendants' failure to exercise even slight care or diligence amounts to gross negligence.

159.    Moreover, had Defendants exercised even slight diligence they would have known their conduct was unlawful.

160.    Defendants' actions evince a reckless disregard for the rights of Plaintiff and others. The actions have the appearance of intentional wrongdoing. Defendants' conduct was part of a broader pattern of misconduct aimed at the public in general.

161.    Defendants' conduct demonstrates a high degree of moral culpability and willful or wanton negligence or recklessness. As a result, Plaintiff is entitled to a punitive damage award.

## FOURTH COUNT

**N.Y. Judiciary Law § 487 (as to Kavulich Defendants)**

162.    Plaintiff repeats and realleges each and every allegation set forth above as if reasserted and realleged herein.

163.    New York Judiciary Law § 487 creates a private right of action against an attorney or counselor who "[i]s guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party;" or "willfully receives any money or allowance for or on account of any money which he has not laid out, or becomes answerable for."

164.    Judiciary Law § 487 is a traditional cause of action in American courts - N.Y. Judiciary Law § 487 is "the modern-day counterpart of a statute dating from the first decades after Magna Carta; its language virtually (and remarkably) unchanged from that of a law adopted by New York's Legislature two years before the United States Constitution was ratified." *Amalfitano v. Rosenberg*, 12 N.Y.3d 8, 14 (2009).

165.    Plaintiff is entitled to actual damages, treble damages, and attorneys' fees and costs for the violations of N.Y. Judiciary Law § 487, and Plaintiff so seeks.

**JURY DEMAND**

166.    Please take notice that Plaintiff demands a trial by jury.

**PRAYER FOR RELIEF**

167.    Wherefore, Plaintiff requests the following relief:

a.  A declaration that Defendants have committed the violations of law alleged in this action;

b.  An order enjoining and directing Defendants to cease violating New York G.B.L. § 349;

c. Actual damages

d. Exemplary and punitive damages;

e. Statutory damages under 15 U.S.C. § 1692k and G.B.L. § 349;

f. An order awarding disbursements, costs, and attorney fees under 15

U.S.C. § 1692k and G.B.L. § 349;

g. Pre-judgment and post-judgment interest as permitted by law;

h. All other and further relief that the Court deems just and proper.

Dated: April 7, 2022

/s/ Ahmad Keshavarz

_____

Ahmad Keshavarz
Emma Caterine
The Law Office of Ahmad Keshavarz
16 Court St., 26th Floor
Brooklyn, NY 11241
Tel: (718) 522-7900
Fax: (877) 496-7809
Email: ahmad@NewYorkConsumerAttorney.com